ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| WECC, Inc. | )  ASBCA No. 60949 |
| | ) |
| Under Contract No. 73-0014-1522 | ) |

APPEARANCES FOR THE APPELLANT:    G. Scott Walters, Esq.
                                  Brian S. Wood, Esq.
                                  Alexander Gorelik, Esq.
                                  Jacob W. Scott, Esq.
                                    Smith, Currie & Hancock LLP
                                    Washington, DC

APPEARANCES FOR THE GOVERNMENT:   Scott N. Flesch, Esq.
                                    Army Chief Trial Attorney
                                  LTC Stephen M. Hernandez, JA
                                  Harry M. Parent III, Esq.
                                    Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE MELNICK

This appeal involves a contract to renovate the exchange at Langley Air Force Base. WECC, Inc. seeks delay damages and other costs. We find that WECC is entitled to recover $546,446.11, plus interest.

FINDINGS OF FACT

I.    The Contract

1. On February 13, 2014, the Army and Air Force Exchange Service (AAFES or government) awarded the contract identified above to WECC to upgrade the Langley Air Force Base Exchange (R4, tab 1). Among other things, the fixed price agreement required WECC to renovate and construct additions to the exchange store, food court, mall, garden area, and shipping areas (R4 tabs 1, 3).

2. The contract drawings identified five separate building areas. They were Administrative, Retail, Mall Shops, Mall Corridor, and Food Court. Each area was then broken into multiple phases reflecting more specific locations in an area. For instance, Phase R-1 in the Retail area was ladies wear and Phase R-8 was menswear, or Phase M-1 in the Mall Shops was the barbershop and Phase M-4 was the beauty salon. WECC was to perform the work in each area in the phased sequences shown on

the drawings, which also specified the number of days that WECC was to spend in each phase. (R4, tab 2 at 4, tab 3 at 39, 111; demo. ex. 1; tr. 1/80) WECC was required to start work within 10 days of its receipt of the March 5, 2014 notice to proceed, and finish 240 days after the receipt, or by October 31, 2014 (R4, tab 1 at 1, tab 17 at 1). In the event WECC failed to complete the work on time, the contract imposed $1,500 in liquidated damages for each day of delay (R4, tab 1 at 55).

3. As required by the contract, WECC prepared a baseline schedule that followed the contract's phase requirements. In accordance with the drawings, the schedule planned for work to proceed in multiple areas concurrently. For each area it established a logical order of specific activities within each phase. (R4, tab 3 at 127, tab 264; demo. ex. 2; tr. 1/88-90, 99-101) Because WECC worked simultaneously in different areas, there were many chains of sequential activities on the project (R4, tab 2 at 4, tab 264). However, the chain with the longest duration was the "critical path." As the longest chain, it reflected the earliest the project could be completed (tr. 2/44). Any delay of a task on the critical path would delay completion of the overall project. As planned, the critical path started with mobilization and then ran through the Retail phases. (R4, tab 234 at 10-11, tab 264 at 1, 3-10; tr. 1/96-97, 109)

4. This contract with AAFES was not subject to the Federal Acquisition Regulation, but contained several clauses imposing comparable provisions (R4, tab 1 at 7). Thus, it contained Differing Site Conditions, Suspension of Work, Liquidated Damages, Retainage, and Changes clauses. Changes were further governed by General Provision 37 controlling price adjustments. (R4, tab 1 at 12, 19-21, 23, 26-27, 29, 55)

II. Performance, Change Orders, and the Claim

5. On March 19, 2014, shortly after receiving the notice to proceed, WECC and its subcontractor encountered unexpected conditions in the floors, which included a second layer of tile beneath the top layer, and an excessively deep mud bed (R4, tab 31 at 3, tab 78 at 11, tab 250; tr. 2/34-35). WECC also discovered that the concrete slab beneath the tile and mud bed was in such poor condition it could not be polished to the glossy surface contemplated by the contract. Instead, WECC had to remove and replace it. (R4, tab 36 at 6; tr. 1/123, 133-34) The government did not approve Change Order No. 11, in Amendment No. 2, for the replacement of concrete until June 19, 2014, and issued unilateral Change Order No. 6A for the demolition of the additional layers on August 27, (R4, tabs 36, 78). Change Order No. 11 was for $253,713. WECC's proposal for the change excluded additional time, extended overhead, and general conditions due to delays until the actual impact could be ascertained (R4, tab 36 at 11, 14). Although the amendment contained language stating that it was "in full settlement of all entitlements...arising from the changes," it also included documents where the parties recognized that extended overhead would be negotiated once all the work was completed (R4, tab 36 at 1-4, 14). WECC was able to perform work while it waited for the government to approve Change

2

Order No. 11 but not on the established schedule (tr. 1/153, 227). Also, the government did not release Mall Corridor Phase M-1A for concrete replacement until July 14, 2014 (tr. 1/140-41). The new concrete was poured between July 17 and 26 or 27 (R4, tab 234 at 15; demo. ex. 8; tr. 1/138, 140-41).

6. On August 11, 2014, while excavating for a footer in the M-1A phase, WECC discovered a storm drain that was not on any plans (R4, tab 85 at 3; tr. 1/141-42, 2/44-48; demo. ex. 8). This required WECC to suspend digging until the government unilaterally issued Change Order No. 52, in Contract Amendment No. 6, on September 29, 2014. WECC was then required to excavate and remove the storm drain and install a new one elsewhere. The change order for $55,940.87 was the full amount WECC had proposed. However, it failed to extend the contract performance period from August 11 until the work was completed, as requested by WECC. Accordingly, WECC reserved the right to seek an equitable adjustment for any extended overhead and general conditions costs. (R4, tab 85 at 1, 3, 20-22; tr. 1/142)

7. In six contract amendments issued during performance, the government acknowledged that the period of performance should be extended for a total of 89 days, to January 28, 2015. WECC signed two of those amendments. The first, Amendment No. 1, issued in May of 2014, approved additional direct costs associated with six change orders dealing with ventilation and plumbing, electrical panels, coil relocation, bulkheads and sprinklers, a floor drain, and light fixtures. It included $8,482 in Change Order No. 4 to relocate the coil and granted a 10-day extension. No extended overhead was included and WECC agreed that the amendment was "in full settlement of all entitlements directly or indirectly arising from the changes." (R4, tab 29) The second, Amendment No. 3, issued in July of 2014, approved direct costs associated with 13 change orders dealing with a freezer floor, electrical panel, feeder cables, gun vault, variable frequency drive, glazing, oven power, poles, light wires, angle removal, transition strip, sills, and a fire connection. It included $18,127.99 in Change Order No. 15 to extend feeder cables and granted 10 more days of extension. Again, no extended overhead was included and WECC agreed that the amendment fully settled all entitlements arising from the changes. (R4, tab 60)

8. The other four amendments granting the remaining 69 days were unilateral orders by the government. Amendment No. 7, issued September 30, 2014, generally added 35 days through Change Order No. 42 and stated that the parties would discuss additional days at the end of the project. The amendment also included Change Order No. 54, adding 7 days for slab replacement at the main entrance for $10,941; and Change Order No. 67, adding 3 days for asbestos abatement in the barber shop for $5,231 (R4, tab 88).[1] Amendment No. 10 included Change Order No. 38A, adding

---

[1] Amendment No. 7 acknowledged in the text that it was granting a total of 45 days, but then erroneously established a new contract completion date that only

7 days to raise sprinkler pipes for $11,971 (R4, tab 104). Amendment No. 11 included Change Order No. 74, adding 14 days to relocate roof drains for $5,837 (R4, tab 107). Finally, Amendment No. 12 included Change Order No. 102, adding 3 days to install temporary fixtures for $2,023 (R4, tab 115).[2] These amendments approved additional direct costs but no extended overhead.

9. One other relevant bilateral amendment that did not extend the contract was Amendment No. 5, issued September 3, 2014, which increased the contract price for installation of a support and freezer, demolition of flooring in the pharmacy, installation of new doors, and accounted for time and materials to install a bulkhead. It also contained the language providing for full settlement of all entitlements arising from the changes. (R4, tab 80)

10. WECC substantially completed the project on July 7, 2015 (R4, tab 283). WECC's last invoice, submitted August 21, 2015, left a contract retainage of $276,408.31 (R4, tab 142).

11. On October 28, 2015, WECC submitted a Request for Equitable Adjustment containing a certification meeting the criteria of the Contract Disputes Act, 41 U.S.C. §§ 7101-09, and that was treated as a claim (R4, tab 148; gov't br. at 31). The claim alleged 249 days of compensable delays by the government and sought extended overhead and miscellaneous costs, pursued subcontractor claims, and added markups, totaling $1,600,664.26 (R4, tab 148). During the next year, the parties engaged in negotiations, which included a visit by WECC's president and project manager to AAFES headquarters in Dallas, a couple of telephone calls, and WECC's modification of its overhead calculations (R4, tabs 158, 164; tr. 3/94, 127).

12. On November 23, 2016, the government unilaterally issued Amendment No. 16, extending the contract 38 more days to March 7, 2015.[3] The contracting officer vaguely explained only that the extension was for "various change orders that WECC requested" and that she considered the number to be "fair and reasonable." Without explaining any calculation, the amendment also approved "General Conditions" compensation in the amount of $2,006 for each of the 38 days, totaling $76,228. The amendment then took a $4,545 credit in favor of the government for drywall and painting.[4] Finally, after deducting another dollar because of an error, the government

---

recognized 42 days (R4, tab 88 at 1, tab 234 at 4). We conclude the incorrect date was a drafting error.

[2] The January 25, 2015 completion date is erroneous due to the government's continuation of its mistake in Amendment No. 7. It should say January 28.

[3] Once again, the March 4, 2015 date in the amendment is off by three days due to the error in Amendment No. 7.

[4] WECC does not dispute this credit.

assessed liquidated damages at the contractual rate of $1,500 per day for 139 days or for a total of $208,500. The contracting officer told WECC that she calculated the liquidated damages from January 25, 2015 until July 22, 2015 (which is actually 177 days), despite the fact that Amendment No. 16 extended the contract to March 7. The total effect of the amendment was to decrease the contract price by $136,818. (R4, tabs 160, 236) The contracting officer never issued a final decision upon WECC's claim and it has appealed here based upon a deemed denial.

13. The total number of days of extension granted in the six amendments issued during performance plus Amendment No. 16 is 127.

III. Delay Analysis

14. WECC alleged a variety of potential delays and disruptions during the course of performance but our conclusions focus largely on the critical path analysis presented by its expert witness, Mr. Mark Doran. Mr. Doran determined the as-built critical path of activities, leading to substantial completion on July 7, 2015, 249 days after the initial scheduled completion date of October 31, 2014. He compared that analysis to the as-planned schedule, accounting for added complexities such as the effect of work performed out of sequence. (R4, tab 234 at 8, 10-11; tr. 2/198-99, 3/8). He broke the project into four periods to facilitate his review.

15. Period 1 spans from the March 5, 2014 Notice to Proceed to August 11, 2014, when excavation of the footings in Mall Corridor Phase M-1A could commence and WECC was performing work in all phases (R4, tab 234 at 14; tr. 2/210). During Period 1 the Mall Shops, Mall Corridor, and Retail areas experienced delays. Phase M-1A was originally scheduled to start by May 8, 2014, but government delays addressing the bad concrete slab and arising from the need to replace it, and the government's continued use of the space for seating, postponed its transfer to WECC by 67 days, until July 14. WECC then had to replace the slab over an 11-day period, followed by 14 more days spent removing and replacing ducts and mechanical equipment. Accordingly, by August 11, 2014, WECC was 92 days behind schedule in Phase M-1A. (R4, tab 234 at 14-17; tr. 2/214, 2/223-28)

16. By contrast, by August 11, 2014, WECC had made up time in the Retail area so it was far less delayed than the Mall Corridor and did not continue as the critical path. Indeed, the Retail phases were complete by the extended completion date in March of 2015, with the exception of two small areas adjacent to the Mall Corridor that could not be performed until the Mall Corridor work was performed. (R4, tab 234 at 19; tr. 2/200-08, 211-15, 218; demo. exs. 7, 9) Also, though there were early delays to the Mall Shops area, on June 14, 2014, the Mall Corridor phases overtook it as the longest path. Additionally, any Mall Shops delay ultimately became irrelevant because it was redesigned later by the government. (R4, tab 234 at 15; tr. 2/221-22)

5

Accordingly, delays in the Mall Corridor phases caused it to become the project's critical path (tr. 2/206-08, 213-14, 218-19, 223-24). There were no other concurrent delays to the critical path and no other critical paths (tr. 2/221-23, 3/12-17).

17. Period 2 runs from August 11, 2014, when WECC attempted to start footing excavations in Phase M-1A and discovered the unexpected storm drain, until a WECC schedule update dated October 29, 2014 (R4, tab 234 at 23). Upon that discovery, WECC had to cease excavating footers. It could not resume excavation until 70 days later, on October 20, 2014, after the government issued Change Order No. 52 and WECC finished removing and replacing the drain. (R4, tab 234 at 23-24; tr. 1/142, 2/238-40) Accordingly, the critical path was delayed the additional 70 days in Phase M-1A (R4, tab 234 at 25). After it finished replacing the drain, WECC took two more days than had been planned performing unrelated structural steel work that was also on the critical path (tr. 2/243). However, during Period 2 WECC performed some out of sequence work in Phases M-2A and M-4A that mitigated 16 days of delay, reducing the net delays during the period to 56 days. There was no concurrent critical path or concurrent delay during Period 2. (R4, tab 234 at 25; tr. 2/238-45)

18. Period 3 covers October 29, 2014 until January 29, 2015 (R4, tab 234 at 26). Mr. Doran claimed there were 78 days of delay to the M-1A phase during that time, but also concluded WECC mitigated 16 days of delay through out of sequence work in Phases M-2A and M-4A, leaving 62 days (R4, tab 234 at 29; tr. 2/247, 251). He stated that among the 78 days were 20 days of steel placement delay and cryptically contended that 10 of those were excusable and compensable because of "prior [o]wner delays." Mr. Doran recognized that 19 days of delay associated with slab work were WECC's responsibility. He then concluded that structural framing began 39 days late, which included 21 days that were excusable because of "rain and weekend work." In summary, Mr. Doran identified 47 days for which WECC was responsible (10 days for steel, 19 days for the slab, and 18 days for framing) and reduces that number by 16 days of mitigation to 31 days that were not excusable and that he assigned to WECC. He suggested the other 31 days (10 for steel and 21 for rain and weekend work) are compensable.[5] (R4, tab 234 at 9, 28-30) There were no concurrent delays during the period (tr. 2/251-52).

---

[5] Elsewhere in his report, Mr. Doran changed his position, indicating that 31 of the 62 days are compensable while not assigning responsibility for the other 31 to anyone (R4, tab 234 at 34). At the hearing, he changed his story again, suggesting that the 31 days he had previously said was WECC's responsibility, and then later said was not anyone's responsibility, was actually an excusable delay because one of WECC's subcontractors could not "get there right away" (tr. 2/255, 3/24).

6

19. Period 4 encompasses January 29, 2014 to the July 7, 2015 substantial completion date (R4, tab 234 at 30). Mr. Doran stated that at the end of Period 3 the project had 120 days of work remaining, dictating an estimated completion date of May 29, 2015. He said the July 7, 2015, actual completion shows that WECC was delayed 39 more days. Mr. Doran explained that on May 12, WECC began Change Order No. 11 slab replacement work in Mall Corridor Phase M-3A, which lasted 21 days until June 2 when M-3A baseline work began. That work was scheduled to take 21 days but WECC completed it and all other Mall Corridor work in 14 days, on June 16, mitigating the slab delay by 7 days. The critical path then shifted from the mall corridor to the unrelated M-7 optometry phase, which was the last area where work needed to be completed. The government reintroduced work in the optometry area that had been previously dropped. Because of the deletion, WECC had lost its place in its cabinet supplier's fabrication schedule, pushing substantial completion 21 more days to July 7. Though the 14 days for the slab and 21 days for optometry add up to 35 days, Mr. Doran concluded his analysis by inconsistently stating WECC required 28 days to perform the slab work, and encountered unspecified adverse weather and "weekend days not worked," to justify suggesting that all 39 days are compensable. There were no other concurrent delays during this period. (R4, tab 234 at 30-31; tr. 2/257, 260, 3/28-31, 33-35)

20. In total, Mr. Doran contended that the government is responsible for 218 days of delay to a modified contract completion date of June 6, 2015 (R4, tab 234 at 34; tr. 3/36, 38).[6]

21. Though the government delayed progress on the project's critical path at different points in time, it never placed WECC in a standby status. Moreover, WECC has not shown that it was not employed working somewhere in the building. Indeed, the evidence shows the contrary (R4, tab 148 at 9-11; demo. ex. 7).

IV.    Quantum Data

22. WECC's Field Office Overhead after October 31, 2014 (also known as General Conditions) is based on daily unit costs for WECC payroll ($882.07 per day), outside labor ($479.43 per day), trucks and fuel ($314.84 per day), and equipment ($153.11 per day). It also incurred lump sum costs over the 218 days of extended performance it claims for per diem ($20,329.37), lodging ($26,079.34), field office and storage ($6,980.74), sanitation ($1,691.84), and traffic barriers and rental ($4,658.22). (R4, tab 148 at 117-42; tr. 3/96-101; app. br. at 37-38)

---

[6] At the hearing, WECC's counsel suggested to Mr. Doran through a leading question that he should add 31 more days to the 218 to reflect that all 62 days of mitigated delay addressed in Period 3 were excusable (tr. 3/36-37). This would extend the contract completion date to July 7, 2015. Because the testimony was more counsel's than Mr. Doran's we give it no weight.

7

<u>DECISION</u>

I.      Compensable Delays and Liquidated Damages

WECC seeks compensation for government-caused delays to the project.  "To prove entitlement for a compensable delay, [WECC] must show that the government was responsible for specific delays; overall project completion was delayed as a result; and any government-caused delays were not concurrent with delays within appellant's control."  *Columbia State Bank*, ASBCA No. 59531, 16-1 BCA ¶ 36,399 at 177,456 (quoting *Versar*, *Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,128).  To establish a causal link, WECC "must show that the government's actions affected activities on the critical path of the contractor's performance of the contract."  *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1317 (Fed. Cir. 2000).

WECC has shown that it encountered 78 days of compensable delay during Mr. Doran's 92-day Period 1.  They include 67 days waiting for permission to access the Phase M-1A Mall Corridor area as well as the government's change order addressing the bad concrete slab, plus 11 more days to perform the work replacing it.  WECC has also shown that by June 14 the delays to M-1A shifted the critical path to that chain of activities, which was an entire month before it became available for work to be performed.  There were no concurrent delays.[7]  (Findings 15-16)  However, WECC has not made any effort to demonstrate that the duct and mechanical work performed over an additional 14 days was a change imposed by the government not already required by the contract.[8]

---

[7] The government presented an expert who suggested that because the as planned critical path ran through the retail area, which he claimed was a parallel critical path to the mall corridor, five time impacts in the retail area pushed the contract completion to May 19, 2015.  He contended that much of those delays were attributable in some manner to WECC.  He said that mall corridor delays then delayed completion into July.  We are not persuaded that the retail area work, which was almost entirely complete before the extended contract completion date in March, remained the critical path given the unrelated mall corridor delays into June of 2015 (findings 16, 19).  Additionally, the government's expert subjectively assigned numerous days of delay or concurrent delay responsibility to WECC based upon his belief that it inadequately or irregularly staffed the project, or made "slow progress."  (R4, tab 1056 at 22-46, tab 1057 at 56, 101) These conclusory assertions lack adequate explanation of their underpinnings for us to be convinced of their merit.  Nor does his report sufficiently show how it calculates its final offsetting concurrent delay figures or support the source of inputs to his calculations (tr. 4/161-62, 177-83).

[8] Mr. Doran's conclusory opinion about the contract's requirements is irrelevant.

8

WECC has shown that it encountered 72 days of critical path delay in Phase M-1A during Mr. Doran's Period 2. Seventy of those days were spent awaiting the government's change order regarding the differing site presented by the unexpected storm drain that blocked excavation, and performing the work removing and replacing it. Two more days were then spent by WECC working on structural steel. However, WECC mitigated 16 days of delay, leading to 56 net days of compensable delay associated with the drain. There were no concurrent delays. (Finding 17)

WECC has not proven any excusable delays during Mr. Doran's Period 3. Mr. Doran generally stated there were 62 net days of delay during this period, which his report broke down to 31 compensable days and 31 that were not excusable and assigned to WECC.[9] However, he only purported to describe 10 compensable days due to "prior owner delays," not 31. WECC has not identified the particular owner delays about which Mr. Doran is referring. Nor does it justify finding them compensable. Beyond that, Mr. Doran did not identify any other compensable delays. He only discussed 21 additional days that he characterized as excusable (not compensable) because of rain and weekend work. WECC has also failed to identify those particular days, or show that it rained during them, or explain why they might be excusable. (Finding 18) The mere possibility that WECC encountered rain, or may have worked on a weekend, does not, by itself, demonstrate an excusable delay.

WECC has shown that it encountered 35 days of compensable delay during Mr. Doran's Period 4. They constitute 14 days of delay performing Change Order No. 11 slab replacement and 21 days in the optometry area resulting from its removal and subsequent restoration to the project. (Finding 19)

WECC is entitled to a total of 169 days of compensable time extension from the October 31, 2014 initial contract completion date to April 18, 2015.[10] It received 127 days of extension from the government, leaving a difference of 42 days (finding 13).

The government is thus entitled to liquidated damages of $1,500 per day for 80 days from April 18, 2015, when WECC should have completed the contract, accounting for government-caused delays, to July 7, 2015, when it actually did, totaling $120,000 (findings 2, 10).

---

[9] Mr. Doran's opinion jumped from stating that the additional 31 days were WECC's responsibility, to their being nobody's responsibility, to finally contending that they were excusable (finding 18 n.5). His lack of certainty leaves us unconvinced that we should find for WECC upon the latter.

[10] $78 + 56 + 35 = 169$.

9

II.     Delay Quantum

A. Extended Field Office Overhead

Relying upon daily unit costs and lump sums, WECC seeks to recover its actual extended field office overhead, or general conditions, for the period of compensable delay.[11]  Field office overhead encompasses costs related to the project but not distributed to particular tasks (tr. 3/89-90).  It can include the cost of supervision, timekeeping, supplies, office trailer, travel, and temporary housing.  Such costs are recoverable due to either an expansion in scope of work or a delay.  *See CDM Constructors Inc.*, ASBCA No. 62026 *et al.*, 20-1 BCA ¶ 37,721 at 183,109; *see also M.E.S., Inc.*, ASBCA No. 56149 *et al.*, 12-1 BCA ¶ 34,958 at 171,855, *aff'd*, 502 F. App'x 934 (Fed. Cir. 2013); *DANAC, Inc.*, ASBCA No. 33394, 97-2 BCA ¶ 29,184; *Able Contracting Co.*, ASBCA No. 27411, 85-2 BCA ¶ 18,017.

The government contends that WECC is barred by the doctrine of accord and satisfaction from recovering any compensation for the 78 days of compensable delay associated with Mr. Doran's Period 1.  An accord and satisfaction is a discharge of a claim because some performance other than that which was sought has been accepted as full satisfaction of the claim.  *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010); *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340-41 (Fed. Cir. 2009).  The government points to the fact that none of the four bilateral amendments (Amendments Nos. 1-3 and 5) provided any overhead yet all of them contained language stating that they fully settled all entitlements arising from the changes.

To prove an accord and satisfaction the government must show proper subject matter, competent parties, a meeting of the minds of the parties, and consideration.  *Meridian Eng. Co. v. United States*, 885 F.3d 1351, 1363-64 (Fed. Cir. 2018) (quoting *Brock & Blevins Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965)); *Bell BCI*, 570 F.3d at 1341.  The subject matter of the changes contained in Amendment Nos. 1, 3, and 5 do not pertain to the causes of the delays we have found here and therefore their language fully settling all entitlements arising from those changes is equally inapplicable (findings 7, 9).  *See Meridian*, 885 F.3d at 1364 n.12 (citing *King Fisher Marine Serv., Inc. v. United States*, 16 Cl. Ct. 231, 236-37 (1989), for the proposition that the subject matter of the contract modification relied upon as an accord and satisfaction must be the same as the disputed claim).  By contrast, Amendment No. 2 did contain Change Order No. 11 for the concrete slab replacement during Period 1 and it included the "full settlement" language relied upon by the government.  However, the amendment also incorporated communications wherein the parties recognized that extended overhead

---

[11] As noted, although the government previously agreed to extend the contract for 127 of the 169 days of compensable extension to which WECC is entitled, none of those extensions provided for any extended overhead (findings 7-8).

10

costs would be deferred for later negotiation once the concrete replacement work was complete and the impact could be determined. (Finding 5) Accordingly, those costs were not within the scope of the amendment's settlement.[12]

Additionally, we can refuse to bar a claim based upon an accord and satisfaction when the government recognizes entitlement to an additional payment after the parties executed the modification upon which the accord and satisfaction defense is premised. *See England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 850 (Fed. Cir. 2004). Here, WECC submitted its claim after the parties executed the amendments containing the "full settlement" language (findings 5, 7, 9, 11). The government responded by then negotiating with WECC about the claim for over a year (finding 11). It followed those discussions by issuing unilateral Amendment No. 16 extending the contract 38 more days for "various change orders" and by approving general conditions compensation in the amount of $2,006 for each of those days (finding 12). There was no mention of accord and satisfaction barring anything. Taken as a whole, the parties' conduct manifested an intent not to consider the "full settlement" language of the contract amendments as an accord and satisfaction. There was no meeting of the minds supporting a bar to this claim. *See Meridian*, 885 F.3d at 1364-65 (recognizing that the meeting of the minds element of accord and satisfaction is informed by continued consideration of a claim after release, that the inquiry is fact specific, and influenced by a wide range of evidence); *Sherman R. Smoot*, 388 F.3d at 850 (finding that payment of a claim after issuance of the modifications purporting to constitute an accord manifested that the parties did not construe the modifications as a release).

The government also maintains that all overhead is capped by the terms of General Provision 37 of the contract. That provision governs contract price adjustments arising from WECC's performance of change orders (R4, tab 1 at 20-21). The government relies upon Paragraph (a)(1) limiting any adjustment to direct costs, plus 10% overhead and 8% profit. Paragraph (a)(2) states that these percentages cover field overhead. Only some of the delays we have found here, such as the periods during which WECC replaced the concrete and drain, involve WECC's performance

___

[12] The government developed no argument regarding the effect of the bilateral modifications on the computation of field office overhead damages except for accord and satisfaction, which we dispatch above. Its single statement in its brief that, "appellant arbitrarily ignores the bilateral amendments to the Contract" (gov't br. at 70-71), omits any explanation of what other effect (besides accord & satisfaction) those bilateral amendments should have, is less an argument than an unsupported allegation that WECC's analysis made a great mistake for reasons the government need not explain. We do not opine here whether there may have been other reasons that those bilateral modifications might have affected the calculation of damages because no argument has been presented about how they would.

of change orders. Other portions of the delays include the time WECC waited for the government to make Phase M-1A available, the time taken by the government to issue change orders, and the extra time required by the government's change of mind respecting the optometry area. But even for those portions relating to change order performance, General Provision 37 is not a constraint upon recovery. The government ignores paragraph (a)(5), which states that "[f]or changes that involve an extension of time the contracting officer may consider alternative equitable adjustments for extended field conditions." (R4, tab 1 at 21) Thus, General Provision 37 recognizes that additional field office overhead may be due when a change not only enlarges the scope of work but extends the period of performance.

There is no evidence that during performance the parties considered General Provision 37(a)(1) to cap field office overhead incurred during the extension period to a set percentage of direct costs. If they had, then Amendment No. 2 would likely have provided that amount. Instead, they deferred negotiating overhead associated with that amendment until the concrete replacement work was complete and the impact could be determined. (Finding 5) "[T]he parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation." *P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1375 (Fed. Cir. 2003) (quoting *Blinderman Constr. Co., v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982)). Similarly, after negotiating WECC's claim with it for over a year, the contracting officer approved Amendment No. 16, extending the contract by 38 days and granting General Conditions costs to WECC. But rather than calculate that as a percentage of some amount of direct costs, the contracting officer agreed to a daily rate of $2,006 per day. (Findings 11-12)

Turning to WECC's claim, it seeks $458,560 in field office overhead incurred over the 218 days it claims to have been delayed. However, we have found that WECC is entitled to 169 days of compensable time extension. Multiplying WECC's four daily unit cost items by 169 equals $309,177.05 (finding 22).[13] Added to that are the lump sum costs WECC incurred for five other items. That total was $59,739.51 over 218 days (*id.*).[14] Prorated to 169 days it equals $46,311.07.[15] Thus, the total field office overhead is $355,488.12.[16] This equates to $2,103.48 per day.[17] It is only marginally different than the $2,006 daily rate the contracting officer acknowledged was owed in Amendment No. 16 (finding 12).[18] WECC simply claims that it is

---

[13] ($882.07 + $479.43 + $314.84 + $153.11) x 169 = $309,177.05.

[14] $20,329.37 + $26,079.34 + $6,980.74 + $1,691.84 + $4,658.22 = $59,739.51.

[15] ($59,739.51 / 218) x 169 = $46,311.07.

[16] $309,177.05 + $46,311.07 = $355,488.12

[17] $355,488.12 / 169 = $2,103.48

[18] The government's program manager suggested at the hearing that the contracting officer was mistaken when she approved $2,006 per day. He said she should not have consented to more than $1,395 per day. He claimed this number is

12

entitled to more days than the contracting officer recognized and at the slightly higher rate. We accept WECC's rate applied over the 169 days of extension to which it is entitled, equaling $355,488.12 in field office overhead. WECC's request for a 10% markup of this amount per the overhead allowance of General Provision 37(a)(1) is denied as seeking a double recovery. WECC's recovery of extended field office overhead under paragraph (a)(5) is in the alternative to the fixed 10% overhead authorized by paragraph (a)(1) (R4, tab 1 at 20-21). WECC is not entitled to both. By contrast, WECC's request for an eight percent profit markup under paragraph (a)(1) is granted because nothing in paragraph (a)(5) precludes it, increasing the total to $383,927.17 (R4, tab 1 at 21).[19]

## B. Extended Home Office Overhead under Eichleay

WECC also seeks to recover $266,186.72 in extended home office overhead based upon the Eichleay formula. Home office overhead includes indirect costs not related directly to a particular project that are incurred to manage all of a contractor's work. These costs are allocated among all of the contractor's projects. (Tr. 3/90-91) *See Williams Constr.*, *Inc. v. White*, 271 F.3d 1055, 1058 (Fed. Cir. 2001) (explaining that home office overhead can include accounting and payroll services, insurance, salaries of senior management, heat, electricity, taxes, and depreciation); *see also West v. All State Boiler*, *Inc.*, 146 F.3d 1368, 1372 (Fed. Cir. 1998) (explaining that indirect costs are ones that continue to accrue despite construction inactivity). If the government suspends or delays work on the contract, these costs may accrue beyond the amount originally allocated to the contract, and thus may become "unabsorbed." *Id.*; *see also B.V. Construction*, *Inc.*, ASBCA No. 47766 *et al.*, 04-1 BCA ¶ 32,604

---

supported by WECC's cost proposal in the contract, which identified $334,645 as "General Requirements." He divided that amount by the 240-day initial contract performance period to attain his number. (R4, tab 1 at 3; tr. 3/181-83) However, the contract does not define the term "General Requirements," and no testimony was presented about the parties' intended meaning of the term. We do not know it reflects WECC's anticipated general conditions costs during the initial performance period. Also, whatever general conditions costs WECC predicted at the time of bidding it might incur for the initial period of performance does not necessarily inform the costs it actually incurred during the extension period. Though she was present during the hearing, the contracting officer did not testify. What we do know is that after negotiating WECC's claim with it she approved general conditions costs of $2,006 per day for the 38 days that she extended the contract in Amendment No. 16 (finding 12). We infer from those acts that she believed this sum reasonably reflected WECC's actual daily rate. In the absence of testimony from her stating that she was mistaken, we are not inclined to conclude that she was.

[19] ($355,488.12 x .08) + $355,488.12 = $383,927.17

13

at 161,358. Often, such costs are recovered through the application of a fixed percentage to the additional costs included in a contract modification or equitable adjustment. *M.E.S., Inc. v. McHugh*, 502 F. App'x 934, 938 (Fed. Cir. 2013) (citing *C.B.C. Enters., Inc. v. United States*, 978 F.2d 669, 674-75 (Fed. Cir. 1992)); *see also Matcon Diamond, Inc.*, ASBCA No. 59637, 20-1 BCA ¶ 37,532 at 182,261. However, under certain circumstances, a daily rate may be employed and is calculated using what is called the Eichleay formula, which is derived from the decision of this Board by that name.[20]

The Eichleay formula is an extraordinary remedy with strict prerequisites. *Williams*, 271 F.3d at 1058; *Matcon Diamond*, 20-1 BCA ¶ 37,532 at 182,259. It is used to compensate a contractor for indirect costs that cannot be allocated for a period the government has made performance impossible while requiring the contractor to remain available to resume performance. However, if the contractor can still perform despite some governmental interference, though not in the way or as efficiently or effectively as it had originally anticipated, Eichleay does not apply. *Williams Constr., Inc. v. White*, 326 F.3d 1376, 1380-81 (Fed. Cir. 2003). Accordingly, one necessary element to recover is that the contracting officer either issued a suspension or other order expressly putting the contractor on standby, or the government delayed performance for an indefinite period during which the contractor could not bill substantial amounts of work on the contract and at the end of which it was required to be able to return to work at full speed and immediately. *P.J. Dick*, 324 F.3d at 1373.[21]

The government never expressly ordered a suspension of work putting WECC on standby. Nor has WECC shown that the government's delays to the critical path, though considerable, completely stopped performance of substantial amounts of contract work so as to effectively place WECC on standby.[22] WECC has not shown that it could not proceed with work in the other areas of the building during those periods, as contemplated by the contract. Indeed, the record shows WECC was employed working somewhere in the building. (Findings 3, 21) Having failed to establish that "much, if not all, of the work on the contract" was effectively suspended, WECC is not entitled to the Eichleay damages it seeks. *P.J. Dick*, 324 F.3d at 1371.

---

[20] *Eichleay Corp.*, ASBCA No. 5183, 60-2 BCA ¶ 2688. *West v. All State Boiler, Inc.*, 146 F.3d at 1379 n.4, provides the formula.

[21] As *P.J. Dick* explains, this is just one of multiple elements to the inquiry. 324 F.3d at 1370-73. It is not necessary to address the others in this decision.

[22] Some of the critical path delays occurred while WECC performed changed work arising from the differing site conditions WECC encountered, such as the slab and the drain. Periods of work on changes are not periods of standby. *Matcon Diamond*, 20-1 BCA ¶ 37,532 at 182,261.

III.     Other Claimed Costs

A.  Additional Field Management Costs

WECC seeks $76,557.30 in additional field management costs it claims to have incurred during the contract's original 240-day period of performance.  It explains the amount reflects the cost of devoting its project manager to the contract full time.  WECC contends that the project manager should only have had to work part time, implying that the government unexpectedly required his full attention and took him away from other productive work (tr. 3/119-20).  WECC has not shown the percentage of the project manager's time it originally built into its contract price, so we do not know how much, if any, additional time he provided.  Although WECC's project manager testified that he did not originally expect to be physically present on the site every day, he did not say that his daily participation from somewhere was unanticipated.  Also, he admitted that he had no other project responsibilities to attend to (tr. 2/9, 54).  WECC did not show that the government required or approved of an increase in the time spent by the project manager beyond the contract's original requirements, or that WECC notified the government that it considered the government to have changed the project manager's performance obligations.  This claim is therefore rejected.

B.  Asbestos Testing

WECC claims $751.50 for asbestos testing.  WECC says that while an outside inspector was looking for mold, he identified a space that might contain asbestos.  WECC then authorized him to perform a test for which he billed WECC $751.50.  The test was positive.  Upon notification, the government ordered WECC to stop work and the government provided abatement.  (Tr. 3/121-24)  WECC has failed to identify a legal basis for it to charge the government extra for this expense incurred without the government's knowledge or consent.

C.  Steel Plates

WECC claims $999.21 for steel plates purchased in support of concrete replacement work (tr. 3/124).  In response, the government observes that Change Order No. 92, included in Amendment No. 10, approved and paid $622 requested by WECC for "[a]dditional steel plates for multiple concrete pours" (R4, tab 104 at 1, 17).  WECC says nothing in reply to the government's demonstration that it was already paid what it sought for steel plates.  Accordingly, the request is rejected.

D.  Internal Contract Administration Costs

WECC seeks $169,048.49 in "internal contract administration costs" representing the labor expenses of its president and project manager preparing and negotiating its claim

15

over a period of 16 months, between July 8, 2015 and November 23, 2016, plus their travel expenses (tr. 3/126-31). The amount is for initial claim preparation, one face to face meeting, a couple of telephone conversations, and preparation of amended documentation (tr. 3/127). The only record of these costs is $2,321.72 in travel charges. WECC could not describe any more specifics about the request. (R4, tab 285, tr. 3/155-56) WECC asserts that the costs it seeks were incurred for the genuine purpose of furthering negotiations and are normally allowable under *Bill Strong Enterprises v. Shannon*, 49 F.3d 1541, 1549-50 (Fed. Cir. 1995), *overruled in part on other grounds*, *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc).

The cover letter to WECC's October 28, 2015, Request for Equitable Adjustment states that it is submitted pursuant to Title 41 of the United States Code, Chapter 71. Additionally, it is certified in accordance with the provisions of 41 U.S.C. § 7103(b) (R4, tab 148). Thus, as we have held, the parties treated it as a Contract Disputes Act claim (finding 11). Accordingly, WECC's claim preparation costs were in furtherance of the prosecution of its claim and are not allowable under *Bill Strong.* 49 F.3d at 1549-50. Also, the Board has observed that the regulation addressed in *Bill Strong*, FAR 31.205-33, expressly excludes costs for officers and employees of the contractor. *Bill Strong* does not support allowing recovery of the internal employee costs sought here by WECC. *See Vistas Constr. of Ill.*, ASBCA No. 58479, 16-1 BCA ¶ 36,236 at 176,797. Finally, WECC has almost entirely failed to offer records supporting its costs.[23] The request is therefore rejected.

### E. Subcontractor Claims

WECC has forwarded documentation purporting to support "pass-through" claims of four of its subcontractors. WECC provides the claim submitted by Global Solutions, Inc., for $22,813.06, alleging it was delayed by "others," along with time sheets and invoices (R4, tab 148 at 157-247). WECC offers an email from Mid-Atlantic Concrete asserting that it made extra trips due to delays, leading to excessive costs. It accompanies the email with an "estimate" for $15,000. (R4, tab 148 at 249-50) WECC submits a letter from Sprinkle Masonry seeking extended overhead for equipment, supervision, and a forklift operator because of the time it took to perform the project. Accompanying the letter is a statement of direct costs for time spent, unit prices, and markups totaling $46,770. (R4, tab 148 at 254-55) Finally, WECC submits an unsigned statement purporting to be from Perfect Polish, the contractor that polished the concrete floors. It addresses the extra repairs it performed, equipment costs for 23 days that machines were idle, and seeks additional compensation for the demolition of tile and mud bed.[24] It says it provided a statement of its costs that are supported by daily reports

---

[23] Thus, even if we were to award an amount for this category it would not exceed $2,321.72 in travel charges for which WECC offered records.

[24] Change Order No. 6A compensated WECC for the tile demolition (finding 5).

and other documentation, but WECC fails to direct us to those materials. (R4, tab 148 at 252)

WECC does not advocate for the subcontractors' claims and does not vouch for their validity (tr. 3/157-58). With the exception of Perfect Polish, WECC presented no sworn testimony about them.[25] Even if we were to give weight to the hearsay correspondence WECC provided, it lacked any detailed explanation or support for the specific delays experienced by the subcontractors or proving their monetary impact. We agree with the government that WECC basically tossed these superficial demands to the Board with almost no effort to prove their merit. They are accordingly rejected.

### F. Bond

WECC relies upon General Provision 37(a) to add a 1.5% markup for "bond premium" upon its recovery.[26] The paragraph recognizes that actual and verifiable payment bond fees may be recoverable when they are the direct costs attributable to a directed change (R4, tab 1 at 20). But WECC has failed to prove the extent of any such obligations. The only evidence WECC offers is testimony stating that, should it prevail in this appeal, it will have to pay bond fees to its surety (tr. 3/133). WECC presents no evidence of those obligations or how they are calculated. Thus, this portion of the appeal is rejected as well.

### G. Unilateral Change Orders

WECC seeks $78,891.26 it says is due for work performed on 14 unilateral change orders. Nine of the change orders involved additional work and WECC complains that the government failed to sufficiently increase the contract price to cover the costs. Three of the orders involved deleted work where WECC claims the government decreased the

---

[25] WECC did present testimony from Perfect Polish's president, but it was unfocused and failed to support its demands. Perfect Polish's purported claim is broken into three categories. They are "Materials," "Labor," and "Equipment." It seeks a lump sum for unidentified materials of $25,263.40, bases $90,031.11 in labor expenses upon 2,823 man hours, and premises $16,675 in equipment costs on 23 days of lost time. (R4, tab 148 at 252) Nothing in the president's testimony shed any light upon the lump sum sought for materials or supported the man hours (tr. 2/131-49). He generally stated that equipment had to be left idle during partial demobilizations, but he did not testify that it added up to the 23 days mentioned in the document or identify any records supporting that figure (tr. 2/137-38). Nor did he identify records supporting the actual costs incurred for idle equipment (tr. 2/145).

[26] WECC would apply this markup upon all of its claim categories except for unpaid unilateral change orders and contract retainage (app. br. at 83-84).

price by more than its cost savings. (App. br. at 49-52, 76-78, 95) Contrary to WECC's contention, two of the change orders, 68 and 104, were never issued by the government (R4, tab 115 at 1, 8, tab121 at 2, 82). For each change order, WECC states the amount authorized by the government and then declares that "WECC, however, substantiated a Contract Price [increase or decrease] of" X dollars. Each statement then cites to various estimates and commentary from WECC or its subcontractors that it submitted with its price proposals. (App. br. at 49-52) WECC offered no contextual explanation of these disparate materials. Otherwise, all WECC relies upon is a short letter from its project manager to the contracting officer generally complaining that the architect/engineer used by the government was "not provid[ing] accurate pricing estimates" and that therefore WECC was performing "at or below cost" (R4, tab 290).

If a change increases or decreases the cost of or time to perform, the contract's Changes clause requires an equitable adjustment (R4, tab 1 at 20). General Provision 37(a) provides that the adjustment for an increase in cost only includes actual and verifiable direct costs, plus indirect costs as calculated by the clause's terms (R4, tab 1 at 20). WECC has not demonstrated for each of the nine additive changes that its actual costs incurred performing were greater than the amounts recognized by the government in the change orders. Instead of actual costs, all it has offered are the estimates it submitted to the government ahead of time and a general complaint to the contracting officer. Without proof that its actual costs exceeded what the government approved, there is no basis for WECC to recover any further amounts. *See United Launch Servs., LLC*, ASBCA No. 56850 *et al.*, 14-1 BCA ¶ 35,511 at 174,067 (explaining that the equitable adjustment to which the contractor is entitled when the government unilaterally changes the contract is limited to those corrective measures necessary to keep the contractor whole); *ACS Constr. Co., of Mississippi*, ASBCA No. 33550, 87-1 BCA ¶ 19,660 (noting that the measurement of an equitable adjustment arising from a change is the difference between the cost of the work as performed and its cost as originally specified).

For the three change orders that deleted work the government is entitled to a price reduction equal to what it would have reasonably cost WECC to perform the eliminated work. Put another way, the deduction should leave WECC in the same financial position it would have been in had there been no change. Determining this figure can be hard because by definition there are no actual costs for us to review. So we must work with the best information available. Significantly, the government bears the burden of proving the amount of a deductive change. *Id.*; *see also Davis Constructors, Inc.*, ASBCA No. 40630, 91-1 BCA ¶ 23,394 (observing that the contractor's reduction in cost is the measure of a deductive change); *Glover Contracting Co.*, ASBCA No. 24973, 84-1 BCA ¶ 16,994 (finding the government failed to demonstrate entitlement to a deductive change), *aff'd*, 758 F.2d 668 (Fed. Cir. 1984) (Table). Here, WECC provided the government with estimates supporting deductions under Change Order Nos. 24, 36, and 80 totaling $24,611. The government, however, increased those deductions by an

18

additional $10,655.63.  (R4, tab 95 at 1, 44-46, tab 121 at 2, 74-79, 114-24).  The government has made no effort to support that determination.  Because the government has failed to carry its burden of proof we conclude that WECC is entitled to a recovery for these change orders in the amount of $10,655.63.

<u>CONCLUSION</u>

WECC is entitled to $383,927.17 for extended field office overhead, and $10,655.63 in unsupported price deductions.  These amounts total $394,582.80.  However, the government's 169 days of delay from the initial contract completion date of October 31, 2014, only lead to a new contract completion date of April 18, 2015.  The government is entitled to liquidated damages of $1,500 per day for 80 days until WECC substantially completed performance on July 7, 2015, or $120,000.  WECC's recovery must also be reduced by the $4,545 maintenance cost that it does not dispute for a new total of $270,037.80.  The government's proffered damages calculations acknowledged WECC's right to recover the $276,408.31 retainage (finding 10; gov't br. at 87, 89).  WECC is therefore entitled to recover $546,446.11, plus interest under 41 U.S.C. § 7109 from October 28, 2015 until date of payment.[27]

Dated:  October 19, 2021

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[27] WECC seeks interest upon the retainage from September 21, 2015, under the Prompt Payment Act (PPA), 31 U.S.C. §§ 3901-06.  Absent a separate claim for PPA interest, we lack jurisdiction over that request and therefore express no opinion upon its merit.  *Westphal GmbH & Co. KG*, ASBCA No. 38439, 91-3 BCA ¶ 24,175.

I concur                                     I concur

RICHARD SHACKLEFORD              J. REID PROUTY
Administrative Judge                  Administrative Judge
Acting Chairman                       Vice Chairman
Armed Services Board               Armed Services Board
of Contract Appeals                   of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60949, Appeal of WECC, Inc., rendered in conformance with the Board's Charter.

Dated: October 19, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

20